UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| United States of America, | ] | |
| --- | --- | --- |
| Plaintiff | ] | |
| v. | ] | 2:16-cr-00023-LSC-WC-1 |
| Christopher Bernard Pitts, | ] | |
| Defendant. | ] | |

**Memorandum of Opinion and Order**

This opinion and order addresses several pending motions. On January 4, 2017, the United States filed a Motion to Exclude Testimony. (Doc. 64.) On April 26, 2017, Defendant, Christopher Bernard Pitts ("Pitts"), filed a *pro se* motion to withdraw his guilty plea in this action. (Doc. 83.) Several days later, he filed an amended motion to withdraw his guilty plea, through counsel. (Doc. 85.) After the United States moved to strike that motion due to it not being signed by Pitts' counsel, Pitts' counsel filed another amended motion to withdraw his guilty plea to correct the error. (Doc. 87.)[1] Pitts filed yet another amended motion to withdraw his guilty plea, again through counsel, on June 8, 2017. (Doc. 90.) There are

---

[1] The Government's motion to strike the pleading (doc. 86) is thus hereby **DENIED as MOOT.**

1

assorted response briefs and replies to these motions.[2] After careful consideration of the issues, the motion to exclude testimony is due to be granted and the motions to withdraw the guilty plea are due to be denied.

I.     Background

Christopher Bernard Pitts ("Pitts" or "Defendant") is, or at least was, an attorney, licensed to practice law in the State of Alabama. On September 30, 2005, he entered into a contractual relationship with the United States Department of Housing and Urban Development ("HUD") whereby he agreed to provide legal/closing services with regard to the sales of homes owned by HUD in North and Central Alabama. This relationship continued into 2008.

As a part of his contractual obligations, Pitts was to open and maintain separate escrow accounts at a financial institution to be used for closings of the sales of the HUD homes in the different geographical areas specified in his contracts with HUD. "Through these escrow accounts, Pitts was to: (1) receive the funds being used to purchase the homes; (2) pay all closing costs, including his fee;

---

[2]     The Government also moved to strike Pitts' July 10, 2017, second reply to the Government's response to his motions to withdraw his guilty plea and exhibits attached thereto, arguing that it was not timely filed and that the Court did not permit him to file a second reply in support of his motion. (Doc. 97.) The motion to strike (doc. 97) is hereby **DENIED as MOOT** considering that the Court is denying Pitts' motions to withdraw his guilty plea. Pitts also filed a motion, and then an amended motion, for oral argument on these pending motions. (Docs. 98 & 99.) The motions for oral argument are hereby **DENIED**. The Government also filed a motion for a status conference on these motions (doc. 100), and that motion is **GRANTED** as the Court has now held several telephone conferences on these issues.

and (3) distribute the remaining balance to HUD by way of a wire to the United States Treasury." (Plea Agreement, Doc. 52 at 6.) In addition, the sale proceeds were to be paid via wire transfer to HUD "no later than 2:00 PM on the business date following a real estate closing . . . ." (*Id.*)

"[A]t some point prior to March 2008, a shortage had developed in both of Pitt's HUD escrow accounts." (*Id.* at 7.) Pitts then transferred various amounts in and out of the accounts. Pitts failed to inform HUD of the "material facts that: (1) there were substantial shortfalls in Pitt's HUD escrow accounts; and (2) Pitts lacked the funds necessary to close transactions involving HUD-owned homes." (*Id.*)

"Beginning in or about March of 2008 and continuing until in or about December of 2008, Pitts perpetuated a scheme to defraud HUD of the proceeds of the sales of HUD–owned homes. He did so by: (1) commingling funds among the various escrow accounts that he controlled without informing HUD of his doing so; and (2) causing to be disbursed from the escrow accounts funds that he transferred and not providing them to HUD."(*Id.*)

Then, "[o]n or about November 21, 2008, for the purpose of executing the above described scheme to defraud, Pitts, located in Montgomery, Alabama, sent an email to a HUD employee located in Atlanta, Georgia."(*Id.* at 8.) Attached to

the email were nine separate requests to wire transfer funds to HUD in connection with the sale of HUD-owned homes that Pitts knew were fraudulent when he sent the email. (*Id.*)

On July 14, 2016, pursuant to the filed Plea Agreement, Pitts entered a plea of guilty to Count One of the Indictment charging him with Wire Fraud in violation of 18 U.S.C. § 1343. The plea proceeding was not, however, without issues. In fact, when originally asked if he wished to plead guilty, Pitts stated the following, "Judge, looking at the plea agreement as it's written, there are simply some things that are factually untrue." (Plea Transcript, Doc. 92 at 3.) The Court then offered the parties an opportunity to discuss the matter while the Court attended to other cases that were then set. At some point later that day, the parties informed the Court that an agreement had been reached.

The new plea agreement was then filed with significant changes to the section entitled "Factual Basis." (*Compare* Original Plea Agreement, Doc. 103-1 *with* Executed and Filed Plea Agreement, Doc. 52.) Some of the specific changes and deletions included by Pitts are as follows. Pitts caused to be deleted the reference in paragraph "f" of the original plea agreement that one method of his perpetrating a scheme to defraud HUD included establishing an additional escrow account to use for closings without informing HUD. (*See* Original Plea Agreement,

Doc. 103-1 at 7.) Pitts also caused to be deleted paragraphs "j" and "k" which described the payoff of the mortgages allegedly owed by his wife. (*See id* at 8.) And lastly, Pitts caused to be added a new paragraph "k" that asserted that he contended that "some portion of the loss amount is attributable to negligence and other acts of non–criminal conduct." (*See* Executed and Filed Plea Agreement, Doc. 52 at 8.) After an appropriate hearing and colloquy with Pitts, the Court accepted his plea of guilty to Count One of the Indictment and adjudged him guilty of the same.

Nothing of significance happened in the case until October 2016 when the probation office submitted its presentence investigation report setting the HUD loss amount at $1,090,888.53. This contributed to a United States Sentencing Guidelines offense level of 20, which, combined with Pitts' criminal history category of I, resulted in an advisory guideline imprisonment range of 33 to 41 months. The Court set Pitts' sentencing but then continued it to allow him to present a witness that he, through counsel, described as an expert on the loss amount. The United States objected to the qualifications of the witness and on May 31, 2017, the Court conducted a hearing to evaluate the qualifications of the witness and to preserve her testimony if it was determined that her testimony and opinions were to be received as an expert or otherwise.

The witness, Mary Anne Harris ("Harris"), is the owner and president of a company called "Positively Balanced" located in Georgia that by her representation reconciles escrow accounts. (Sentencing Transcript, Doc. 93 at 4.) Harris attended some college and then in 1992 obtained her certificate as a paralegal. (*Id.* at 8.) None of her paralegal or college ducation dealt with reconciliation of escrow accounts. (*Id.* at 49.) Harris worked as a paralegal until 2003 (reconciling trust accounts as part of her duties) before starting her current business. (*Id.* at 8.) While Harris has not published anything on reconciliation, she has spoken at approximately four seminars about the subject. (*Id.* at 52.)

Pitts first contacted Harris in 2011, resulting in her beginning an overview of his escrow accounts. (*Id.* at 9.) Pitts provided her then with his physical escrow account bank records even though the records were not complete. (*Id.*) At some point, Harris sent Pitts' records off to a third-party service that was to manually enter the data so that the information could be analyzed through the use of a software tool entitled "RynohLive." (*Id.* at 10.) Pitts put the work on hold in 2012 and then recommenced it in late 2014. (*Id.* at 12-13.)

Harris "supervised" various employees (none of which have been identified to the Court) in performing the work, particularly in 2014 and 2015. (*Id.*) As a

result of the application of the software to the data, as well as a review of what were described as "exceptions," Harris offers certain conclusions and opinions.

The first opinion she seemed to offer in her testimony was that there were "multiple reasons why there were issues with the accounts." (*Id.* at 15.) She then listed, for example, how checks were not properly imputed even though they had cleared, and wire transfers were sent out multiple times. (*Id.* at 16.) Also, Harris asserted that there was $178,972.86 in bounced items that had been deposited into an escrow account—not indicating which account or further if those funds were expended from that account after the deposits. (*Id.* at 37.) She stated that there was $130,450.55 in "double wire transfers" out of the accounts—again not indicating which accounts or whether those funds were recovered. (*Id.* at 36.) She further stated that there was $4.3 million in "missing deposits" that were not able to be verified as clearing the bank. (*Id.* at 32.)

These assertions seemed to culminate in her conclusion that the accounts were not handled in a proper manner: more to the point that they were handled negligently, or not reconciled in a reasonable time. (*Id.* at 18.) Certainly the accounts were improperly handled. However, whether that was the result of negligence versus criminal action is not the subject of any opinion this Court would be inclined to accept from Harris.

It is interesting to note that many of the conclusions reached by Harris were the result of the application of the third-party software RynohLive itself or in conjunction with the software originally utilized by Pitts. (*Id*. at 38-42.) Harris did not develop and does not own RynohLive but has utilized it in her business. (*Id.* at 38.) Regardless, her description of how the software works in her opinion letter comes almost exclusively from the RynohLive website. (*Id.* at 39.) Also, on cross examination, Harris acknowledged that the $4.3 million in unverified deposits could have been legitimate deposits. (*Id.* at 53.) As she went on to explain, she did not have access to all of the bank records and so the deposits were simply unverified. (*Id.*) It was at this point that she disclosed that she was completely dependent upon the records that Pitts gave her. (*Id.*) Clearly, her opinions were controlled by the data given to her by Pitts, the individual attempting to gain from her records review. Also, Harris did not review any of Pitts personal bank records and she did not obtain any records whatsoever directly from any bank. (*Id.* at 54.) The cross examination of Harris went on to demonstrate holes in much, if not all, of her data, such as not verifying the "double wire transfers," to name one (*see id.* at 56), but it will serve no purpose to list them further.

Harris offered some similar and some different opinions in her "report" dated February 4, 2017, than she did in her testimony before this Court. In an

abundance of caution, these will also be addressed herein. Specifically, beginning on page 4 of her report, Harris, in paragraphs "A" through "O," appears to set out proclamations of Pitts' innocence. (*See* Doc. 71-1 at 4.) She concludes, after each accusation, the statement: "We found no evidence of Mr. Pitts . . . for personal use or other benefit." (*See id.*) For example, paragraph "A" states: "We found no evidence of Mr. Pitts taking on or after October 14, 2008 from any escrow account the amount of $79,429.21 for personal use or other benefit." (*See id.*)

## II. Discussion

### A. Government's Motion to Exclude Testimony

Pitts offers the opinions of Harris as an expert. Rule 702 of the Federal Rules of Evidence, which controls the admission of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Thus, in determining the admissibility of expert testimony under Rule 702, this Court must engage in a rigorous three-part inquiry.

> Trial courts must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is

sufficiently reliable as determined by the sort of inquiry mandated in *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

"The proponent of expert testimony always bears 'the burden to show that his expert is "qualified to testify competently regarding the matters he intend[ed] to address; [ ] the methodology by which the expert reach[ed] his conclusions is sufficiently reliable; and [ ] the testimony assists the trier of fact."'" *Id.* (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (alterations in original)). This burden applies in civil and criminal cases alike whether the proponent is the government or the accused. *Id.*

Pitts has failed to meet his burden at each juncture of the *Daubert* analysis. Harris is wholly unqualified to render the proffered opinions. She has a certain amount of practical experience reconciling bank and escrow accounts but, as evidenced by her willingness to jump to conclusions without a complete review of all records (as opposed to those provided by her then-employer, Pitts), she lacks the training, education, and skill to properly plan, manage, and analyze a financial review of this type. Secondly, Harris doesn't know the methodology she utilized—

or I should say that the third-party software vendor utilized. As such, she cannot include a description of it for evaluation. Basically, she had the documents sent off to a vendor who allegedly imputed them into a software system. She then had her employees check the list of exceptions but failed to do anything that went beyond the documents provided by her employer, Pitts. Indeed, Harris could have simply presented a spreadsheet delineating the exceptions, but in that event, the documents would have spoken for themselves and eliminated any need for Harris's testimony.

In addition, the proffered testimony will not assist the trier of fact. The data imputed into the software clearly was lacking. The only thing Harris can truly testify to is that she sent off the records she received and got reports back from a vendor reflecting where there were exceptions and listing the various balances. To paraphrase an old saying about computers, when biased and incomplete information is imputed into the reconciliation software, biased and incomplete conclusions naturally come out.

Finally, Harris proposes to opine that as to each allegation in the Indictment, "We found no evidence of Mr. Pitts . . . for personal use or other benefit." This is for the trier of fact, is not at all helpful to this Court, and is beyond the scope of her

expertise. For the foregoing reasons, the Government's motion to exclude testimony is due to be granted.

### B. Pitts' Motions to Withdraw Guilty Plea

Pitts may withdraw his guilty plea if he "can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). "In determining whether the defendant has met this burden, the district court may consider the totality of the circumstances surrounding the plea." *United States v. Buckles,* 843 F.2d 469, 471–72 (11th Cir. 1988). "Factors analyzed include (1) whether close assistance of counsel was available; (2) whether the plea was knowing and voluntary; (3) whether judicial resources would be conserved; and (4) whether the government would be prejudiced if the defendant were allowed to withdraw his plea." *Id.* at 472 (citation omitted). "The good faith, credibility and weight of a defendant's assertions in support of a motion [to withdraw a guilty plea] are issues for the trial court to decide." *Id.* Additionally, "[t]he longer the delay between the entry of the plea and the motion to withdraw it, the more substantial the reasons must be as to why the defendant seeks withdrawal." *Id.* at 473.

As an initial matter, Pitts filed the *pro se* motion to withdraw his guilty plea on April 26, 2017, a little more than ten months after he pled guilty to Count One of the Indictment before the Honorable Wallace Capel Jr., United States

Magistrate Judge. In order to cure any technical issues, his counsel filed the same motion on May 13, 2017, and then two additional amended motions in May and June 2017. This ten-month delay is sufficiently long such that Pitts' reasons for desiring to withdraw his guilty plea must be substantial.

Pitts contends that he should be allowed to withdraw his guilty plea "based on newly discovered evidence that he is innocent of the charges against him." (Doc. 87 at 1). Specifically, Pitts asserts that in December 2016, after he received the presentence investigation report on October 24, 2016, he retained the services of Mary Anne Harris, who determined the source of the shortfalls in his escrow accounts. (Doc. 87 at 2.) This Court has already ruled that Harris's alleged expert opinions do not meet the requirements of *Daubert* and will not be allowed. However, it is interesting to note that Pitts alleges that "none of the . . . evidence was available in July 2016 when [he] entered a guilty plea." (*Id.* at 3). This statement is patently false. Harris herself testified that she received all of the documents that were the source of her opinions in 2011 when she began processing them. (Sentencing Transcript, Doc. 93 at 9). It was Pitts who directed her to "hold off" and did not re-engage her services until late 2016. Thus, it is simply not accurate for Pitts to state that the opinions of Harris were not available in July 2016. Clearly, Pitts was dissatisfied with the Sentencing Guidelines range when it was

13

disclosed in October 2016 and thus re-engaged Harris. Either way, Harris presumably would have arrived at the same opinions prior to Pitts' plea date in July 2016.

      Further, a review of the matters Pitts had removed from the factual basis of the proposed plea agreement as being "factually untrue" demonstrate that he was aware of at least *his* version of the facts before he entered into the guilty plea. Specifically, Pitts had removed from the factual basis of the proposed plea agreement the reference in paragraph "f" that one method of his perpetrating a scheme to defraud HUD included establishing an additional escrow account to use for closings without informing HUD. This is one of the very same items of "newly discovered evidence" Pitts now contends he has discovered. More specifically, Pitts contends that he has now located a copy of "the agreement he signed with Land America, requiring that [he] open that third account . . . ." (Doc. 87 at 4). Even if Pitts did not know where he had physically stored that agreement, without question he knew it existed, that he could obtain a copy from Land America, and, as such, it is not "newly discovered evidence." Further, Pitts caused this factual allegation to be removed prior to entering into the plea. It was thus not a part of the factual basis supporting the guilty plea.

Another basis Pitts relies upon for his motion to withdraw his guilty plea pertains to the accounting errors that apparently he, or his staff, committed with regard to the escrow accounts. Pitts asserts that this information is newly discovered evidence. First, as previously ruled, Harris's opinions will not be permitted, but even if they were, the source of the escrow account shortages is a part of the overall situation but not a necessary part of the proof for conviction.

Pitts pled guilty to wire fraud. Specifically, he pled guilty to perpetuating a scheme to defraud HUD of the proceeds of the sales of HUD-owned homes. He did so by: "(1) commingling funds among the various escrow accounts that he controlled **without informing HUD of his doing so**; and (2) causing to be disbursed from the escrow accounts funds that he transferred and not providing them to HUD." (Plea Agreement, Doc. 52 at 7 (emphasis added)). Even if Pitts' commingling of the funds was the result of negligence (and the Court does not by this statement indicate agreement with Pitts' position), such does not equate to innocence of the fraud charged. Further, the total amounts of various "accounting errors" do not total an amount sufficient to account for the HUD shortfalls, and it is clear that Pitts did not inform HUD of the commingling but nonetheless sent the email to the HUD employee with the fraudulent representations on November 21, 2008, which is referred to in paragraph 16. j. of the factual basis portion of the plea

agreement. (*See* Doc. 52 at 8.) In sum, what Pitts describes as "newly discovered evidence" is not newly discovered and even if it was, it makes no difference.

With regard to the other considerations this Court must take into account in deciding whether Pitts may withdraw his guilty plea, the Court notes that it is without question that Pitts, a then-practicing attorney at law, had the "close assistance of counsel" prior to and at the time of his guilty plea. (*See generally* Plea Transcript, Doc. 92).[3] Further, a review of the plea transcript demonstrates that the plea was knowing and voluntary. In other words, Pitts knew his rights, understood everything that was going on, understood exactly what the United States had to prove to establish his guilt, understood the range of punishment, and knew exactly what he had done. To the extent he argues that "newly discovered evidence" demonstrates his innocence, this Court has herein above addressed his argument and rejected it. In addition, "judicial resources would not be conserved" by allowing Pitts to set aside his guilty plea merely because he is unhappy with what he expects his Sentencing Guidelines range of punishment to be. Finally, allowing Pitts to set aside his guilty plea would prejudice the Government. The United States has relied upon the guilty plea and prepared for sentencing. Should Pitts be allowed to withdraw his plea, the United States would be required to prepare their

---

[3] Retained attorney Raymond Bell, Jr. was present and activity assisting Pitts throughout the plea proceeding.

case for trial for a second time. For all of the foregoing reasons, the motions to withdraw the guilty plea are due to be denied.

## III. Conclusion

The Government's Motion to Exclude Testimony (doc. 64) is hereby **GRANTED**. Pitts' motions and amended motions to withdraw his guilty plea (docs. 83, 85, 87, & 90) are hereby **DENIED**.

**DONE** AND **ORDERED** ON OCTOBER 30, 2017.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704