IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 2:16-cr-023-LSC-WC |
| | ) | |
| CHRISTOPHER BERNARD PITTS | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This matter is pending sentencing before the District Judge on Defendant's plea of guilty to one count of wire fraud affecting a financial institution. After Defendant filed a sentencing memorandum and hundreds of pages of supporting documents, the District Judge entered an Order (Doc. 117) noting that Defendant appeared to be arguing that the loss amount to be utilized at sentencing should be drastically less than that calculated by the United States Probation Office in the pre-sentence investigation report (PSR). Accordingly, the District Judge referred the matter to the undersigned "for a report and recommendation as to the calculations of the total loss or intended loss for the purposes of sentencing guidelines calculations as well as restitution." Doc. 117. For the reasons that follow, the undersigned RECOMMENDS that the District Judge reject Defendant's arguments and adopt the amount of loss set forth in the PSR for purposes of calculating both the sentencing guidelines offense level and restitution.

## I.     BACKGROUND

On February 2, 2016, Defendant was charged in the Indictment (Doc. 1) with nine counts of wire fraud affecting a financial institution. In relevant part, the Indictment

charged that in 2005 Defendant, then a practicing attorney licensed in Alabama, contracted with the United States Department of Housing and Urban Development ("HUD") to serve as the closing attorney for sales of single-family homes owned by HUD located in northern and central Alabama.  Defendant's contracts with HUD were renewed for one year in 2006 and 2007, with an expiration set for the Fall of 2008.  Pursuant to the contracts, Defendant was to establish escrow accounts for each of the contracts, one covering certain counties in northern Alabama and the other covering certain counties in central Alabama.  For each closing he conducted, Defendant was to receive the funds to purchase the home, deduct closing costs, including his fee of $575.00 per closing, and wire the remaining funds to HUD via the United States Treasury.

The Indictment further alleges that, by March 2008, a shortage had arisen in Defendant's HUD escrow accounts, causing Defendant to misuse his HUD escrow accounts and commingle funds with other accounts.  For instance, Count One alleges that, on August 6, 2008, contrary to the terms of his contracts with HUD, Defendant opened a new account at Regions bank and began using that account to receive and disburse funds from HUD transactions, regardless of whether the related funds should have been handled through the designated HUD account corresponding with the region where the transaction occurred.  Then, from August 19, 2008, through October 9, 2008, Defendant wired money from his HUD accounts to other accounts and used those funds to pay personal and/or business expenses of Defendant and his wife.  Thus, the Indictment charged in Count One that, because Defendant failed to disclose to HUD the existing shortfalls in his escrow accounts, that he lacked funds required to pay to HUD money that it was owed, and that he

had utilized funds from his escrow accounts to pay personal debts, he had obtained property belonging to HUD before converting it to his own use and had utilized the wires to perpetrate this scheme to defraud HUD, in violation of the federal wire fraud statute. Likewise, Counts Two through Nine identified eight different real estate closings spanning from October 17, 2008, through November 13, 2008, for which Defendant received wire transfers to his HUD escrow accounts but failed to remit to HUD any of the proceeds as required by the contracts.  According to the Indictment, Defendant utilized the wires by, *inter alia*, emailing a HUD employee on November 21, 2008, documents he knew to be false in that they represented that Defendant had requested that his bank wire the funds for these eight transactions when he had not, in fact, made such request of his bank.

On July 14, 2016, pursuant to a written plea agreement, Defendant appeared before the undersigned to change his plea of not guilty on Count One of the Indictment to guilty. In doing so, Defendant specifically admitted that he sent the November 21, 2008, email to HUD in order to execute his fraudulent scheme against HUD.  Doc. 52 at ¶ 16(j).  After Defendant entered his guilty plea, the District Judge set this matter for sentencing on November 10, 2016.  Doc. 55.  However, as Defendant and the Government filed several motions concerning, *inter alia*, the scope of evidence to be presented at sentencing, actually conducting the sentencing proceeding proved to be elusive.  Upon Defendant's motion, sentencing was continued to January 12, 2017.  Doc. 59.  Sentencing then was reset for February 16, 2017, and then again for February 23, 2017, and then again for April 13, 2017. Docs. 66, 76, 80.  Then, based upon the Government's motion, sentencing was continued to May 31, 2017.  Doc. 82.  On April 26, 2017, Defendant filed his pro se Motion to

Withdraw Guilty Plea.  Doc. 83.  Defendant then filed amended Motions to Withdraw his Guilty Plea on May 5, 2017 (Doc. 85), May 13, 2017 (Doc. 87), and June 8, 2017 (Doc. 90).  Ultimately, the District Judge denied Defendant's request for leave to withdraw his plea (Doc. 107) and again set this matter for sentencing on January 18, 2018.  Doc. 110.  After sentencing was reset for February 2, 2018 (Doc. 113), Defendant filed his above-mentioned sentencing memorandum and exhibits on January 26, 2018.

After the District Judge referred this matter to the undersigned, a scheduling conference was held on February 6, 2018, at which the undersigned advised Defendant of his need to clarify his sentencing memorandum's arguments and the relevance of the substantial documents he had submitted in support of the memorandum.  The undersigned reduced those concerns to an Order (Doc. 120) requiring Defendant to file a revised sentencing memorandum and allowing the Government time to respond.  As Defendant's revised sentencing memorandum and the Government's response have been filed, the matter is ripe for the following recommendation to the District Judge.

## II.    THE PRESENTENCE REPORT'S CALCULATION OF LOSS

The PSR's loss calculation is the aggregate of fifteen closings for which Defendant received funds but did not transfer funds to HUD, as required by his contracts.  The fifteen closings occurred in October and November of 2008, and the total amount owed, but not delivered, to HUD from the subject closings is $1,090,888.53.

## III.   DEFENDANT'S ARGUMENT

Notably, Defendant does not argue that he remitted to HUD any of the funds from the fifteen transactions that comprise the total loss calculated in the PSR.  Rather, in his

Revised Sentencing Memorandum, Defendant argues that the money he failed to deliver to HUD was lost for a "multitude of reasons, including negligence, before October 2008 and November 2008[.]"  Doc. 121 at 1.  He asserts that these losses caused a "shortfall" in his HUD escrow accounts that prevented him from paying the funds owed to HUD for the subject fifteen transactions, which were the final transactions Defendant participated in pursuant to his HUD contracts.  *Id.* at 1-2.  Defendant maintains that the shortfall in his HUD accounts, which he indicates was actually $1,418,229.47, "was a result of negligence and not criminal in nature."  *Id.* at 2.  He argues that, pursuant to his plea agreement with the United States, he "should not be held responsible for monies lost and or not accounted for due to" the following: "Stolen, embezzled, or converted HUD monies by employees or others;" "Monies negligently or Recklessly Misapplied;" "Unfunded Closings (Dry Closings);" "Funds Not Received;" "Voided/cancelled checks that cleared accounts;" "Duplicate and over payments to HUD;" "Returned deposited items;" and "Missing deposits."  *Id.* at 3.

Defendant asserts that the greatest part of his "shortfall" was due to "unfunded closings" in which "money was never received or replaced."  Doc. 121 at 3.  Defendant identifies sixteen such "unfunded closings," resulting in a shortfall of $1,039,526.14 in his HUD accounts.  *Id.* at 3-14.  Defendant's proof of these "unfunded closings" consists of, for each closing, photocopies of the deeds and/or mortgages associated with the closing and printouts of excerpts of bank statements that do not reflect the deposit of the subject funds into his HUD accounts.  *See, e.g.,* Doc. 121, Exs. A – P.

In addition to "unfunded closings," Defendant identifies a number of other circumstances that contributed to his shortfall that should not be included in any loss calculation for sentencing purposes.  For example, Defendant claims a further $130,450.56 shortfall resulting from "duplicate/over payments to HUD."  Doc. 121 at 14.  Defendant's proof of such duplicate or overpayments to HUD consists of excerpts from his HUD account statements indicating duplicate wire transfers to HUD on September 14 and 21, 2007, in the amount of $27,965.53, on November 1 and December 5, 2007, in the amount of $63,361.31, and on February 22 and 29, 2008, in the amount of $38,853.71.  *See* Doc. 121, Ex. Q.  Defendant also argues that $111,726.37 of his shortfall was the result of "Returned Deposited Items" that "were never refunded, recovered or replaced."  Doc. 121 at 15.  Here, Defendant again points to bank statements showing, on six instances, returned deposits in his accounts.  *See* Doc. 121, Ex. R.  Defendant also argues that $83,891.03 of his shortfall was the result of "missing deposits/funds not received" from HUD buyers.  Doc. 121 at 16.  Defendant's proof of such missing deposits is a January 31, 2008, letter from his bank showing that the bank "lost proof" of four separate deposits totaling that amount.  Doc. 121, Ex. S.

Defendant also argues that $31,204.50 of his shortfall was the result of "fifty (50) voided/cancelled checks from November of 2006 until October of 2008 that cleared the bank . . . [but] were never refunded, recovered or replaced."  Doc. 121 at 16.  Defendant's proof of such appears to be a spreadsheet he prepared or had prepared on his behalf.  *See* Doc. 121, Ex. T.  Defendant also argues that $21,430.87 of his shortfall was the product of "bank fees" that "were never refunded, recovered or replaced."  Doc. 121 at 17.

6

Defendant's proof consists of monthly bank statements for his three accounts which indicate the bank's fees for each month. *See* Doc. 121, Ex. U. Defendant also claims he should get a "credit" for $633,912.31 for funds he paid to HUD from his non-HUD account. Doc. 121 at 17. Defendant's proof of such payments consists of bank statements from an account opened under the name "Christopher B Pitts P C, Real Estate Closings Inc." that show a number of wire transfers to HUD between July 6, 2007, and April 10, 2008. *See* Doc. 121, Ex. V.

Defendant further argues that, notwithstanding the allegations in paragraphs thirteen and fourteen of the Indictment—that Defendant transferred $183,694.00 from his HUD account to a non-HUD account and then used those funds to discharge mortgage debts in the name of his wife—he should receive credit for $183,694.00 because the transfers were negligently made from his HUD account but were "justified." Doc. 121 at 17. He further argues that the properties subject to the mortgages he is alleged to have paid off with HUD funds "went into foreclosure after payoff was made and [were] not paid off in full as alleged in indictment." *Id.* Defendant's proof of such "negligent" application of his HUD account's funds appears to consist of photocopies showing the mortgages executed in his wife's name. *See* Doc. 121, Ex. W. Relatedly, Defendant argues that the allegation in paragraph nine of the Indictment—that on March 17, 2008, he caused $165,505.53 to be transferred from a business checking account to one of his HUD accounts to help him cover his HUD account's shortfall—is explained by the fact that those funds were the proceeds of a referral fee he received from a local law firm and that he subsequently withdrew that exact amount from his HUD account in August of 2008. Doc. 121 at 18. He asserts that,

because there was no loss or damage to HUD from his deposit and subsequent withdrawal of the funds in his HUD account, the total loss calculation in the PSR should be reduced by $165,505.53.  *Id.*

Defendant's final argument of import for the amount of loss calculated in the PSR is that a former employee of his, Lisa Jordan, "embezzled money from June of 2006 Until December 2006.  Those embezzled funds were never replaced by Lisa Jordan or Regions Bank."  Doc. 121 at 18.  Defendant does not indicate how much money was embezzled or provide any proof of the amount that he feels should be credited towards the loss calculation as a result of the purported embezzling.

## IV.   LOSS CALCULATION PRINCIPLES

The District Judge has referred this matter for a recommendation as to the amount of loss to be utilized in determining Defendant's offense level under the sentencing guidelines, and for purposes of ordering restitution.  "The Government bears the burden of establishing the loss attributable to the defendant by a preponderance of the evidence[.]"  *United States v. Cavallo*, 790 F.3d 1202, 1232 (11th Cir. 2015) (citing *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011)).  "The Sentencing Guidelines do not require a precise determination of loss."  *Id.*  Rather, the court need only make a "reasonable estimate" of the loss based on the available information.  *Id.* (quotation and citation omitted).  Importantly, considering the nature of Defendant's voluminous exhibits submitted in support of his argument that he is entitled to myriad credits against HUD's loss, this burden "does not demand that the Government and the court sift through years of bank records and receipts to ascertain itemized proof of every single transaction that should

8

be chalked up as a loss to the victim." *United States v. Campbell*, 765 F.3d 1291, 1304 (11th Cir. 2014) (citing *United States v. Orton*, 73 F.3d 331, 334-35 (11th Cir. 1996)).

As to the sentencing guidelines, and as noted in the PSR, in an offense involving fraud, including wire fraud, § 2B1.1 of the Sentencing Guidelines is the relevant guideline for determining a defendant's offense level, which necessarily entails determining the amount of loss attributable to the fraud offense. In determining loss, the "general rule" is that "loss is the greater of actual or intended loss." U.S.S.G. § 2B1.1, app. n. 3(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense[,]" while "Intended loss" "means the pecuniary harm that the defendant purposely sought to inflict[.]" *Id.*, app. n. 3(A)(i)-(ii). As the loss calculation in the PSR is explicitly premised on the actual loss suffered by HUD, this Recommendation is concerned only with the principles surrounding the calculation of actual loss. In that vein, a few more definitions are important. "Pecuniary harm" "means harm that is monetary or that otherwise is readily measurable in money." *Id.*, app. n. 3(A)(iii). "Reasonably foreseeable pecuniary harm" is "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*, app. n. 3(A)(iv).[1]

In addition to the foregoing, the Guidelines provide for certain exclusions from loss and credits against loss. *See id.*, app. n. 3(D) & (E). Defendant does not specifically invoke

---

[1] Importantly, the Guidelines' definition of "actual loss" "incorporates [a] causation standard that, at a minimum, requires factual causation (often called 'but for' causation) and provides a rule for legal causation (i.e., guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination)." *United States v. Stein*, 846 F.3d 1135, 1152 (11th Cir. 2017) (quotation marks omitted).

any of these exclusions or credits in his arguments that he is entitled to various credits against the amount of HUD's actual loss, despite that, essentially, he seeks a cumulative credit against HUD's actual loss in an amount significantly greater than that loss. This is so because, as will be shown below, the credits Defendant seeks against the amount of loss are not authorized by the Sentencing Guidelines.

The court's amount-of-loss inquiries with respect to the sentencing guidelines and restitution are merged. In general, the "method for calculating actual loss, as opposed to intended loss, under the Sentencing Guidelines is 'largely the same' as the method for establishing actual loss to identifiable victims under the [Mandatory Victims Restitution Act]." *Stein*, 846 F.3d at 1153 (quoting *United States v. Caravallo*, 790 F.3d 1202, 1239 (11th Cir. 2015)). Thus, "[i]n most cases, the amount of actual loss under the guidelines will be the same as the restitution figure." *Id.*

## V.   APPLICATION

Defendant does not argue that the amount of loss calculated in the PSR is incorrect—that HUD did not actually lose $1,090,888.53 due to his failure to pay to HUD the proceeds of fifteen separate closings that he performed under his contracts. As such, it appears that Defendant concedes "factual causation," *i.e.*, that, but for his fraudulent scheme, HUD would not have suffered the loss described in the PSR. Defendant also does not appear to argue that HUD's pecuniary harm was not a reasonably foreseeable result of his effort to fraudulently conceal the shortfalls in his HUD accounts. Thus, it appears "legal causation" under the relevant Guideline is satisfied. Furthermore, insofar as Defendant presents any arguments about the amount of loss, he has not argued, and cannot show, that

any portion of the PSR's proposed amount of loss is attributable to the various factors discussed in his Revised Sentencing Memorandum. That is, none of the fifteen closings comprising HUD's actual loss were "unfunded," none were paid to HUD in duplicate, none caused a "returned deposit item," none resulted in a "missing deposit," none were paid by Defendant from a non-trust account, and none were the subject of embezzled funds by one of Defendant's employees. While Defendant argues that some of those circumstances caused him to be unable to pay for the final fifteen closings comprising HUD's loss, that argument ignores that it was the scheme to conceal these circumstances from HUD that allowed him to continue receiving HUD's money and, ultimately, cause the pecuniary harm described in the PSR.

Defendant's argument is only that he is entitled "to credit for the amounts enumerated" in his Revised Sentencing Memorandum that he attributes to circumstances including, *inter alia*, his own negligence, bank error, and employee misconduct. Doc. 121 at 19. But Defendant does not explain how any of the "credits" he seeks are provided for in the express portion of the Guidelines allowing for "Credits Against Loss" in the limited circumstances described in the Guidelines. *See* U.S.S.G. § 2B1.1, app. n. 3(E). Indeed, Defendant's Revised Sentencing Memorandum omits any discussion of the relevant loss calculation principles guiding this court's inquiry. Defendant cites to no statute, guideline provision, or case law substantiating his many arguments that the loss calculation set forth in the PSR should be reduced or offset for the reasons he proposes, including that he was negligent, that he was the victim of an embezzler, and that he did not derive personal benefit from HUD's loss. Instead, Defendant appears to assert that the PSR's loss amount should

11

be reduced or offset, not because of any legal requirement, but because, according to his interpretation of his plea agreement, "Defendant should not be held responsible for monies lost or not accounted for" due to such reasons.  Doc. 121 at 3.

Defendant's plea agreement, however, does not absolve Defendant of his obligation to show that his arguments are legally sound.  In fact, the plea agreement only speaks to the Government's conduct at the sentencing hearing:

> The Government agrees to recommend that the loss calculation should not include monies that the defendant negligently or recklessly misapplied and that the defendant did not intentionally misappropriate to his own use or benefit or funds embezzled, stolen, or converted by others or funds not received, cancelled checks, voided checks, duplicate payments, missing deposits (i.e., deposits that did not clear the bank), voided checks that cleared accounts, returned items, overpayments to [HUD], overpayments to others, returned deposit items, unfunded closings, and third-party closings.

Doc. 52 at 2-3.  Notwithstanding what the Government previously said that it would "recommend" at sentencing, the plea agreement is clear that "the Court will determine the loss amount at the sentencing hearing."  *Id.* at 2.  Moreover, insofar as the Government agreed to make such a "recommendation" at sentencing, the Government has cancelled the plea agreement due to Defendant's repeated efforts to withdraw from the agreement.  *See* Doc. 114 at 2; Doc. 124 at 7.  Thus, Defendant gets no succor from the Government in his effort to show that he is legally entitled to the offsets or credits he has proposed.  Nor is it the court's obligation to conjure the requisite legal arguments on Defendant's behalf.

Defendant's failure to offer a legal basis for his arguments is understandable—his theory appears fatally flawed considering the charge to which he has pled guilty. Defendant did not plead guilty to stealing and using HUD's money or even to poor

fiduciary management of HUD's money.  While allegations to that effect form the factual basis of his plea, Defendant only pled guilty to using the wires to perpetrate a scheme to defraud HUD of the proceeds of sales of HUD-owned real estate.  To that end, Defendant admitted to commingling funds in his various accounts and transferring money out of his HUD accounts without paying those funds to HUD.  Furthermore, knowing that he had developed a shortfall in his HUD accounts, he failed to disclose to HUD that he lacked the funds to close the HUD transactions for which he was serving as the closing attorney. Defendant further admitted to using email to provide HUD with evidence of his having submitted twenty-six different requests to wire funds to HUD, despite knowing that nine of those twenty-six requests were fraudulent.  *See* Doc. 52 at 7-8.

In other words, Defendant masked the shortfall in his HUD accounts by using the proceeds of newer closings to pay for older closings for which he had failed to pay HUD. Once Defendant's contracts expired and he was no longer able to float his scheme with new closings, Defendant was unable to pay to HUD the proceeds of the final fifteen closings described in the PSR.  Defendant's failure to alert HUD to the shortfall, and his direct attempt to conceal its existence in an email transmission with HUD, constituted fraud on HUD for which Defendant utilized the wires to perpetrate.  Thus, HUD's loss from Defendant's scheme has nothing to do with how Defendant's shortfall came to be or whether or not Defendant "gained" from HUD's loss.  Rather, HUD's loss was factually and legally caused by Defendant's efforts to conceal the shortfall while continuing to obtain HUD's money until the money finally ran dry.

In sum, Defendant does not contend that HUD did not actually lose the amount of money described in the PSR.  Furthermore, Defendant presents no legal authority for his proposition that HUD's total loss due to Defendant's fraudulent scheme is somehow reduced because the shortfall was purportedly due to a raft of bad luck, negligence, or third-party criminality.  Likewise, Defendant presents no legal authority for his argument that HUD somehow did not suffer a loss due to his fraud scheme simply because he, purportedly, did not personally benefit from funds that he failed to pay to HUD.  Nor is any such authority known to the undersigned.  Defendant's failure to provide a legal basis for his theory of calculating (or reducing) HUD's actual loss defeats any contention that HUD did not actually lose the amount described in the PSR, or that he is entitled to certain credits against that loss.

Notwithstanding Defendant's dispositive failure to legally sustain his argument in the Revised Sentencing Memorandum, Defendant's arguments about the various credits to which he claims entitlement are problematic in other respects.  First, as to the sixteen unfunded closings that comprise the largest portion of the overall credit against loss Defendant seeks, Defendant offers proof of nothing more than that he did not receive deposits into a specific HUD account for the exact amount of the sale on the date of the closing or within the month that the closing occurred, as reflected in his submitted bank statements.  *See* Doc. 121, Exs. A-P.  Importantly, Defendant does not point to specific wire transfers in his bank statements—or any other evidence—showing that HUD was actually paid for the sixteen "unfunded closings" despite that Defendant purportedly did not receive funds from the mortgage lenders.

14

In any event, rather than offering definitive proof of an actual "unfunded closing" which Defendant presumably nevertheless paid with his own funds or with funds from other HUD sales, Defendant's evidence in support of the unfunded closings only begs more questions. For example, Defendant has admitted both to commingling funds in his accounts and that he "negligently or recklessly misapplied" funds by, in some cases, paying HUD directly from his non-HUD account. *See* Doc. 121 at 17. Why, then, should the court credit Defendant's implicit contention that he did not actually receive the funds from any of the "unfunded closings" in one of his other accounts that he was using at the time of the closing and for which he has not provided the court with any account statements? Defendant also does not explain why he went on to pay HUD the proceeds of sales for which he did not receive funds, rather than alerting HUD to the fact that the closings were not funded. Defendant also does not explain whether he attempted to collect on any of the "unfunded closings" from any of the supposedly derelict mortgage lenders, and, if not, why that failure should cause harm to HUD rather than Defendant. Nor does Defendant explain why HUD's losses under such circumstances should not be attributable to his scheme to defraud HUD when, at a minimum, his failure to alert HUD to these purported unfunded closings caused HUD to continue utilizing his services for real estate closings despite his admitted negligent or reckless stewardship of HUD's funds. Finally, Defendant does not point to any specific witness or piece of evidence that he could offer to explain these issues. Defendant's failure to confront these factual and legal weaknesses defeats his claim that he is entitled to any "credit" for "unfunded closings."

Defendant's argument that he made duplicate or over payments to HUD is also unavailing.  In particular, as argued by the Government, Defendant has only offered proof that on three separate occasions he indeed made duplicate payments to HUD from his HUD accounts, totaling $130,450.56.  *See* Doc. 121 at 14; *id.*, Ex. Q.  Of course, none of these payments were in satisfaction of any of the fifteen closings comprising HUD's actual loss.  Moreover, although Defendant asserts that these duplicate payments were never "refunded, recovered or replaced by HUD[,]" Doc. 121 at 14, he does not provide any proof beyond his unadorned conclusion that, in fact, HUD did not repay Defendant for those three duplicate payments, or even that he requested HUD to do so.  Considering the apparent shoddy accounting practices that caused Defendant to make the three duplicate payments in the first place, as well as caused him to receive payments into the wrong HUD account, or pay HUD from the wrong account, or commingle personal and/or business funds with his HUD account funds, without proof of his claim, Defendant is not entitled to the benefit of the doubt that he in fact did not receive a refund or reimbursement from HUD for any duplicate payments.  Finally, even if the court credited his claim that he made duplicate payments to HUD for which he received no refund, and is therefore entitled to a credit against HUD's actual loss for that amount, the amount in question is insufficient, standing alone, to reduce Defendant's Guidelines offense level increase owing to the amount of loss. *See* U.S.S.G. § 2B1.1(b)(1)(H), (I).

Defendant's proof of $111,726.37 in "returned deposit items" for which he seeks a credit against HUD's loss is also lacking.  Defendant only offers proof of six instances in which, indeed, the bank returned a deposited item, and made a corresponding withdrawal

16

from Defendant's HUD account, presumably for insufficient funds.  *See* Doc. 121, Ex. R. Of course, none of these returned deposits pertained to any of the fifteen closings comprising HUD's actual loss.  Defendant does not provide any narrative description of the circumstances surrounding these returned deposits, including whether any of them actually pertained to real estate closings he conducted for HUD.  Four of these instances were for amounts less than $1,500, suggesting that the returned deposits were likely not the proceeds of HUD-owned real estate closings.  *Id.*  Even as to the two larger returned deposit items, one a wire transfer of $63,278.81 from Franklin America on June 23, 2006, the other a $45,569.90 withdrawal from one of his HUD accounts on November 5, 2008, Defendant's proof is lacking.  As to the former, Defendant offers nothing showing that the returned deposit item constituted proceeds intended to be paid to HUD or that it was not later replaced by Defendant with proceeds from a bank or mortgage lender in that account or one of his other accounts.  As to the latter, Defendant only offers proof of a returned deposit for $45,569.90 on November 5, 2008, in the third account that he opened to conduct his HUD business.  Notably, in Count One of the Indictment, to which Defendant has pled guilty, Defendant's use of this third account is described as a violation of Defendant's HUD contracts.  *See* Doc. 1, ¶10.  In any event, Defendant does not explain the provenance of the returned deposit item or how it related to any of his HUD dealings.  Nor does he explain the apparent subsequent deposit of the exact same amount into his account on November 12, 2018.  *See* Doc. 121, Ex. R., tab 15.  The court can only speculate why any of this should count as a credit against HUD's actual loss.

Defendant's claim that he is entitled to a credit for "missing deposits" is also problematic.  Defendant only provides a January 31, 2008, letter from his bank showing that on December 14, 2007, it had lost proof of deposit of four different amounts totaling $83,891.03, along with a bank statement for the affected account for December of 2007. *See* Doc. 121, Ex. S.  Notably, the letter states that the bank provided Defendant's account with provisional credit for the full amount of the "missing deposits" and directed Defendant to collect the missing deposits from the relevant payors so that Defendant may then issue a check to the bank to reimburse the credit it had provided.  *Id.*  Although Defendant asserts that the funds "were never refunded, recovered or replaced from HUD Buyers," Doc. 121 at 16, he does not explain the provenance of the missing deposits, whether the bank ever actually deducted the provisional credit from his account, or whether he ever sought to collect the missing deposits from the buyers as instructed by the bank.  Defendant also does not explain why, if indeed the missing deposits were never replaced by HUD buyers, his failure to collect the funds should redound to HUD rather than Defendant.

Defendant next offers, without context, that he should receive a credit for $31,204.50 for "voided/cancelled checks" that "were never refunded recovered or replaced."  Doc. 121 at 16.  Defendant's proof consists only of an Excel spreadsheet that he, or someone acting on his behalf, compiled.  *See* Doc. 121, Ex. T.  Defendant does not explain the context of any of these voided or cancelled checks or how they relate to any HUD transactions for which HUD was fully paid.  Nor does Defendant explain whether he pursued and obtained any remedies related to any of the voided or canceled checks and, if not, why HUD should nevertheless bear the loss flowing from his failure to act.

18

Defendant's contention that he should receive a credit for bank fees is wholly undeveloped.  Although Defendant provides bank records showing that he was charged $21,430.87 in his three HUD accounts over the relevant years, *see* Doc. 121, Ex. U, as a factual matter, Defendant provides no argument that he should not have been charged with the fees.  More importantly, as a legal matter, he points to no authority showing that those fees—whether the product of legitimate banking practices or bank error or something else—should be paid by HUD or should otherwise somehow count against the loss HUD suffered due to Defendant's actions.

Defendant's apparent claim that he should receive a credit of $633,912.31 because he paid that amount to HUD from one of his non-HUD accounts is also unavailing.  Of course, Defendant provides no context for any of these non-HUD account transfers to HUD.  Obviously, none of these transfers were related to the fifteen closings for which HUD was never paid.  Instead, for proof, Defendant provides only the first page of his bank account's monthly statements showing the subject withdrawals via wire transfers to HUD. *See* Doc. 121, Ex. V.  Although Defendant has admitted to commingling his funds, he provides nothing showing that he did not actually receive deposits in his non-HUD account for the very same funds he wired to HUD from that account.  Indeed, for every month he provides a statement showing a transfer to HUD from his non-HUD account, Defendant received deposits in that account of at least $816,642.98, and as much as $1,405,676.94. *Id.*  Frankly, Defendant is not entitled to any presumption that he was paying HUD out of his non-HUD account without receiving HUD funds into that same account.  Without

19

definitive proof of such, the court should not entertain any claim for a credit against HUD's loss of the amount that he can show he paid to HUD from a non-HUD account.

The remainder of Defendant's Revised Sentencing Memorandum and related exhibits is of little use in adjudicating Defendant's argument that he is entitled to a credit against HUD's loss for the reasons mentioned in the plea agreement. Defendant appears to offer an explanation for the source of funds in his HUD account which, the Indictment appears to allege, he used to pay the personal debts of he and his wife, and he argues that it was merely negligence that caused him to pay other personal debts from his HUD account rather than a non-HUD account. Doc. 121 at 17-18. Whatever the veracity of such contentions—and make no mistake, they are problematic—they have nothing to do with the loss amount set forth in the PSR or Defendant's claim that he is entitled to certain credits against that amount. Rather, they appear more relevant to Defendant's quixotic quest to undue his guilty plea. But that effort has already been foreclosed by the court. Likewise, Defendant's argument that he was obligated or required to create the third HUD account, and that doing so was not a violation of his contracts as alleged in the Indictment, *see id.* at 18, is irrelevant to HUD's actual loss or his claim for credits.

Finally, Defendant's conclusory charge that his former employees embezzled from his office for six months in 2006, and that such embezzled funds were never replaced by the employees or the bank, is presented without any prospect of further, relevant factual development. Of course, none of the proceeds of the fifteen closings comprising HUD's actual loss were embezzled by Defendant's employees. Further, Defendant provides no explanation for why, legally, HUD should be made to bear the cost of his employees'

20

embezzling.  Nor does Defendant provide any specifics as to the amount of purportedly embezzled funds so that the court can consider whether, and how much, to credit HUD's actual loss.  Thus, this argument merits no further consideration.

As discussed above, Defendant has presented the court with a number of legally unsupported, contrived, and factually specious arguments in support of the frankly audacious claim that he is entitled to credits against HUD's loss that actually exceed the amount of HUD's loss.  It is fair to wonder, as the Government notes, is Defendant "asking that, in conjunction with the sentencing hearing, HUD be ordered to pay him $850,134.95—the difference between the value of [Defendant's] claimed credits and the undisputed actual loss[?]" Doc. 124 at 7 n.4.  Indeed, in making the claim that he is entitled to more credits than HUD actually lost, it is reasonable to conclude that Defendant is attempting to do through his sentencing arguments what he could not do through his many motions to withdraw his plea: dispense with the implications and ramifications of having pled guilty.  That is, having unsuccessfully sought to withdraw his guilty plea, at sentencing Defendant apparently seeks to so minimize or mitigate his conduct—and HUD's loss as a result of that conduct—such that he is, effectively, absolved of guilt and not worthy of the punishment concomitant with his crime.

However, for the reasons set forth above, the hundreds of pages of supposed proof Defendant has offered to establish his entitlement to such credits falls far short of achieving this objective, or even fostering the abiding concern that Defendant's arguments merit further development.  Likewise, Defendant's vague and general synopses of witness testimonies that he would present in support of his claims do not indicate that he will be

able to surmount the legal and factual deficiencies of his arguments at an evidentiary hearing. *See* Doc. 121 at 18-19. Thus, the undersigned concludes that the court need not delve further into the morass of documents and ill-conceived theories and arguments that Defendant attempts to foist on the court. Instead, the court is amply justified in concluding that Defendant has no objection to the figure of HUD's actual loss propounded in the PSR, and, moreover, that he has no legally or factually viable argument that HUD's actual loss should be reduced or offset due to the circumstances described in the plea agreement and in Defendant's Revised Sentencing Memorandum.

## V.   CONCLUSION

For the reasons stated above, the undersigned RECOMMENDS that the court conclude that Defendant has not presented any cogent objection to the amount of loss found in the PSR and, moreover, that he has not presented any viable argument that he is entitled to a reduction or offset of that amount in his Revised Sentencing Memorandum. As such, the undersigned RECOMMENDS that the court adopt the PSR's loss calculation for purposes of both the calculation of Defendant's sentence under the relevant sentencing guidelines and for purposes of any order of restitution.

It is further ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **June 28, 2018**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 14th day of June, 2018.


/s/ Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE